IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 5, 2002

## STATE OF TENNESSEE v. DERICK BAILEY

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-B-1017    Seth Norman, Judge**

———————————

**No. M2001-02411-CCA-R3-CD - Filed April 15, 2003**

———————————

The appellant, Derick Bailey, was convicted by a jury in the Davidson County Criminal Court of one count of felony murder and one count of premeditated first degree murder. The trial court merged the convictions and sentenced the appellant to life imprisonment. On appeal, the appellant contends that the evidence was not sufficient to support the verdicts. Although we conclude that the evidence was not sufficient to support the conviction for premeditated murder, the evidence was sufficient to support the conviction of felony murder. Accordingly, we affirm the appellant's conviction for first degree felony murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed as Modified.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

Michael A. Colavecchio and Paul J. Bruno, Nashville, Tennessee, for the appellant, Derick Bailey.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Pamela Anderson and Shelli Neal, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
### I. Factual Background

On December 27, 1998, the victim, Timothy Chandler, was spending the evening with his girlfriend, Yolanda Foxx, and other family members. Chandler left Foxx's apartment to rent movies and buy candy for his children. He was driving a metallic gold Chevrolet Camaro, which had expensive chrome wheels and a loud radio. Chandler frequently purchased gas at the Aztec convenience store on Dickerson Road and had a habit of using a gasoline pump on the back side of the building. He carried his money "[i]n a roll. Folded up in half . . . with the rubber band around the money."

Mary Ann Fenter lived next door to the Aztec store. On December 27, 1998, she stopped at the store on her way home from work and parked her vehicle next to an ice machine on the back side of the store. To the right of her vehicle, Fenter noticed a man lying motionless on the ground between two gas pumps. Another man was "hovering" over the man, with his hands on the man's jacket. Immediately upon seeing Fenter, the man who was standing got into a champagne-colored vehicle and left. Fenter was unable to see the man's face, but noticed that he was wearing a dark stocking cap and a dark jacket.

Tammie Michelle Taylor was working at the Aztec store on the evening of December 27, 1998. Taylor knew the victim and recalled that he came into the store that evening to purchase gas. A surveillance camera located in the store verified that at 7:48 p.m. the victim prepaid for ten dollars ($10) worth of gas, using ten one-dollar bills. Upon learning that a man was lying on the parking lot, Taylor immediately called the police. Subsequently, when speaking with the police, Taylor recalled that "one of the twins" had been in the store earlier that evening. Although Taylor recognized "the twins," she did not know their names. After speaking with the police, Taylor called a friend who told her the twins' names. Taylor relayed this information to the police.

Charles E. Vaughn was returning to his home around 9:00 or 10:00 p.m. on December 27, 1998, when he observed a vehicle that had been partially stripped. The vehicle was parked on a dead end street approximately five to ten minutes from the Aztec store on Dickerson Road. At trial, Vaughn testified that a fire was burning in front of the vehicle; however, the vehicle was not on fire. Upon closer examination, Vaughn observed a puddle of gasoline in front of the vehicle and noticed an "oily spot" leading from the puddle to the car. He did not see anyone in the area.

On the evening of December 27, 1998, Alvin Hall, III, was with his twin cousins, Derick and Erick Bailey and another cousin, Jevon Garrison. The group was riding in Derick Bailey's blue Cadillac. Derick Bailey, the appellant, was driving and Erick was riding in the front passenger seat; Hall and Garrison were riding in the back seat. Because of the loud radio, Hall was unable to hear the conversation between the twins. The group drove down Dickerson Road and had gone one to two blocks past the Aztec store when the appellant pulled into the parking lot of a gas station and turned around. The appellant drove back up Dickerson Road and pulled into the parking lot of a Taco Bell restaurant next to the Aztec store.

When the vehicle stopped, Erick got out and walked across the back of the Taco Bell parking lot toward the rear of the Aztec store. The appellant then drove out of the Taco Bell parking lot and pulled into the Aztec parking lot, parking in front of the store. Hall entered the store and purchased a drink. While inside the store, Hall saw Erick loitering about. Erick made no purchases and left the store through the rear door, near the back gas pump. Hall then left the store through the front door and got back into the Cadillac. Shortly thereafter, Garrison stated that he "heard something," and then added, "He got hit." The appellant immediately drove along the back side of the parking lot, exiting to the rear of the store. Erick did not rejoin the group. As the group was leaving the parking lot, Hall saw a light-colored Camaro in the exit area of the parking lot. Hall was unable to identify the driver of the Camaro, but did note that the driver was wearing a stocking cap.

Hall also viewed the surveillance videotape from the store, identifying himself and Erick on the videotape. Erick was wearing a stocking cap.

After exiting the parking lot, the Camaro turned right onto Dickerson Road. The appellant also turned right onto Dickerson Road, following the Camaro. When the Camaro turned left onto Bellshire, the appellant also turned left onto Bellshire. Hall then told the appellant that he wanted to be taken home. The appellant refused, calling Hall and Garrison "Hoes." Nevertheless, the appellant turned onto Westchester and let Hall and Garrison out of the vehicle.

The next day, Detective E.J. Bernard contacted Hall. Hall spoke with Detective Bernard and confirmed that the appellant smoked cigarettes. Hall noted that although the twins are identical, they can be distinguished by their dental work, explaining that "Derick's got gold, Erick don't."

Detective Danny Satterfield of the Metro Police Department was assigned to the "Murder Squad Unit" in December 1998 and was called to the crime scene at the Aztec store. He remained there briefly and then proceeded to Jackson Road, a few miles away in a more rural area off Dickerson Road where the victim's Camaro had been found. The tires and wheels had been removed from the vehicle and were missing, as was the vehicle's radio. Detective Satterfield noticed a strong odor of gasoline and saw indications of a fire underneath the vehicle. Detective Satterfield also noticed a partially burned cigarette laying in the driver's seat of the vehicle.

Later that night, in response to information he had received regarding potential suspects, Detective Satterfield went to the Dellway Villa apartments, located in the vicinity of the Aztec store and Jackson Road. As Detective Satterfield drove into the apartment complex, he met a vehicle matching the description of the vehicle which was reportedly involved in the murder. Detective Satterfield, who was driving an unmarked car and was accompanied by other police vehicles, attempted to stop the approaching vehicle by activating his car's flashing blue lights. When Detective Satterfield initiated the stop, a passenger in the approaching vehicle "took off running." Other officers pursued the individual, later identified as Erick Bailey, and took him into custody.

Detective Tim Mason of the Metro Police Department processed the crime scene at the Aztec store. Later, he was sent to the Dellway Villa apartments to look for a "blue over white Cadillac." As Detective Mason was driving into the apartment complex, he met a car matching that description. When he and another detective blocked the road with their vehicles, the right front door of the Cadillac opened and a suspect "jumped out and ran." Detective Mason pursued and apprehended the suspect. However, when Detective Mason returned to his vehicle, the Cadillac was gone. A short time later, the Cadillac was located inside the apartment complex, parked in front of the apartment of Erick Bailey's girlfriend. Detective Mason explained that because the officers had blocked the road leading into the apartments, the Cadillac had been unable to exit the complex.

Tim Matthews, a Metro police officer, took photographs of the scene at the Aztec store and also at the location where the victim's car was found. Approximately one and one-half

hours elapsed from the time he received a call regarding the shooting at the Aztec store and the time the victim's car was located. Officer Matthews noted that all four tires and the radio were missing from the Camaro. The smell of gasoline permeated the area and a partially burned cigarette was laying in the front seat of the vehicle. Officer Matthews was able to see an outline where gasoline had been poured inside the vehicle and he noticed that the seats were wet from the gasoline.

Detective E.J. Bernard of the Metro police homicide department was called to the Aztec store on December 27, 1998. Upon arrival, Detective Bernard found no physical evidence that a crime had been committed. Detective Bernard interviewed witnesses at the store and individuals who lived near the store and then proceeded to the location where the victim's car had been found. In response to information he received, Detective Bernard began searching for two individuals. He spoke with Alvin Hall who provided him with the names of both individuals. At the time of his conversation with Hall, Detective Bernard had already obtained an arrest warrant for Erick Bailey.

Detective Bernard was present when Erick was apprehended at the Dellway Villa apartments. Erick had nine hundred eighty dollars ($980) in his possession at the time of his arrest. The money was not rolled up, but "was just flat[,] . . . held together with a rubber band."

Subsequently, Detective Bernard spoke with the appellant by telephone. Thereafter, the appellant, accompanied by his mother and girlfriend, went to the police department and spoke with Detective Bernard. According to the appellant, on the evening of the shooting, he, along with his brother Erick and two cousins, drove to the Aztec store in the appellant's blue Cadillac. While they were in the parking lot, the appellant heard a shot and immediately drove around the back of the store. The appellant saw the Camaro leaving, but did not see the driver. The appellant admitted that he followed the Camaro onto Dickerson Road, then turned onto another street where he left his cousins. The appellant stated that he did not know what happened to his brother. The appellant maintained that he spent that night at a motel with his girlfriend, but he could not recall the name of the motel or the name under which he had registered.

Detective Bernard admitted that the appellant voluntarily came to the police department and gave consent for his car to be searched. The appellant advised Detective Bernard that he would likely find a Pioneer stereo in the car and also a chrome rim with a tire which he had purchased on the street and which was probably stolen. When Detective Bernard located the Cadillac, he found that the trunk had been forced open and was empty. After the car was towed, Detective Bernard looked inside the vehicle with a flashlight and noticed in the back seat what appeared to be the impression of a tire.

Officer Charles Ray Blackwood worked in the "Identification Section" of the Metro Police Department. His duties included processing and photographing vehicles, searching for fingerprints, and looking for items "specific to a particular case." In the instant case, Officer Blackwood processed the Camaro and the Cadillac. He observed that the tires and wheels had been stripped from the Camaro and a strong odor of gasoline permeated the vehicle. Several items appeared to have been removed from the glove box, placed on a seat, and soaked with gasoline.

During his processing of the vehicle, Officer Blackwood discovered an invoice from Dunlap and Kyle Tire Company. However, the information on the invoice was not legible due to damage from the gasoline. Also located inside the Camaro was a Hollywood Video bag containing two video tapes and a tub of popcorn, a bag of candy, and a bag containing steaks. The vehicle's radio and speakers had been removed. Officer Blackwood observed that the vehicle's ignition switch had not been damaged, indicating that the vehicle had been stolen with the key.

Officer Blackwood processed the Camaro and the Cadillac for fingerprints. He was able to lift fingerprints from a propane bottle found in the back of the Camaro and from a mini-blind box also found inside the car.

While processing the Cadillac, Officer Blackwood noticed a large amount of dirt inside the vehicle. The dirt was on the back of the front seats, the headrest area, and the back of the driver's seat, and was particularly heavy on the vehicle's back seat. Using a technique called "cross lighting," Officer Blackwood was able to see where a tire had been placed on the back seat of the Cadillac. Explaining the technique, Officer Blackwood stated that he took a flashlight and "shined it across the surface, almost at a ninety degree angle. And what that does is it causes the dirt, blocks the light going across it and causes shadows. And it also highlights the dirt and whatever's on the surface. And that developed when I was able to take a photograph of that marking on the dirt on the seat. . . . The mark on the, or the impression on the seat, the print from the tire sidewall, I took that once I took the original photograph and I digitally flipped it." As a result, Officer Blackwood was able to see letters indicating a particular type of tire.

Following this lead, Officer Blackwood went to Dunlap and Kyle Tire Company and spoke with the store supervisor, Ronald Eakes. Eakes viewed the photograph showing the tire imprint and immediately identified the tire as a "Grand Spirit." Eakes explained that the "Grand Spirit" tire was manufactured specifically for Dunlap and Kyle, the only tire company from which the tire could be purchased. The victim, Timothy Chandler, had been to the store several times and had purchased a "Grand Spirit" tire for his Camaro. Eakes mounted the tire on the Camaro and engaged in conversation with the victim regarding his expensive wheels. Eakes discovered that the eye-catching wheels cost $4800 to $5000.

Julia Hooper, a police identification supervisor with the Metro Police Department, testified at trial that she examined three different latent fingerprints submitted in the instant case. Hooper explained that the police department's policy required that all latent fingerprint identification be verified by a second examiner. Hooper verified that the fingerprints submitted were those of the victim and Erick Bailey. She noted that the print taken from the propane bottle matched the right thumbprint of Erick Bailey. Hooper conceded that the appellant's fingerprints were not found on either vehicle.

Dr. John E. Gerber, a forensic pathologist, testified at trial regarding the autopsy of the twenty-five-year-old victim. The autopsy verified that the victim died as the result of a gunshot

wound to the chest. The bullet perforated the heart, aorta, liver, and spine. Dr. Gerber detailed how the bullet entered the victim's chest, traveled through the pericardium sac around the heart, and passed through the right side of the heart, the liver, and the aorta. The bullet continued through the vertebrae, injuring the spinal column before exiting the body. The injuries caused massive internal bleeding. Dr. Gerber also explained the lack of blood at the crime scene, noting that with this type of injury, the bleeding was internal rather than external. The blood filled the victim's abdominal region and the area where the lung had collapsed.

Dr. Gerber stated that an examination of the victim's clothing revealed the presence of soot or stippling, an indication that the gun was fired from six inches to two feet away from the victim.

The appellant testified on his own behalf at trial. He admitted that on the evening of December 27, 1998, he was with his twin brother, Erick, and his cousins, Hall and Garrison. The group drove down Dickerson Road and eventually got into the drive-thru line at a Taco Bell restaurant located next to an Aztec store. Erick got out of the appellant's Cadillac, expressing his intention to go to the Aztec store. Due to the long line at the drive-thru, the appellant got out of line and "went to the Aztec to wait for [Erick]." When the appellant parked the Cadillac, Hall got out of the car and went into the store to purchase a drink, returning shortly thereafter. Garrison, who had remained in the car, stated that he "heard something." The appellant immediately drove around the back of the store to look for Erick, thinking that perhaps Erick was confused about where he would be picked up. At the rear of the store, the appellant saw a body on the ground near the gas pumps. He saw the Camaro "exiting out" but was unable to see the driver.

The appellant did not locate his brother but decided to leave because he was frightened. The appellant drove out of the parking lot and took his cousins to Westchester, several miles away. He and his girlfriend then spent the night in a motel. The appellant maintained that he had never been to Jackson Road. When the appellant realized that a warrant had been issued for his arrest, he voluntarily surrendered to the police and consented to a search of his blue Cadillac.

The appellant was convicted of one count of felony murder and one count of premeditated first degree murder. On appeal, the appellant contends that the evidence was not sufficient to support the convictions.

## II. Analysis

The appellant's sole complaint on appeal is that the evidence was not sufficient to support his convictions. Specifically, the appellant maintains that the State failed to prove that the appellant knew of a plan to rob or murder the victim, failed to prove that the appellant assisted his brother in carrying out the plan, and failed to prove that the appellant intended to benefit from the proceeds of the robbery. Further, the appellant argues that the record was devoid of any proof regarding premeditation.

In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a criminal trial. In essence, a jury conviction removes the presumption of the defendant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The State may prove a criminal offense by direct evidence, circumstantial evidence, or the combination of the two. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); see also State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992) (noting that "the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence"). Before a jury may convict a defendant of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971); see also State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). As in the case of direct evidence, the weight to be given circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1611).

The appellant was convicted of one count of premeditated murder and one count of murder in the perpetration of a robbery. Both crimes constitute first degree murder. Tenn. Code Ann. § 39-13-202(a)(1)-(2) (Supp. 2002); see also State v. Hurley, 876 S.W.2d 57, 70 (Tenn. 1993). First degree murder is defined as "[a] premeditated and intentional killing of another" or "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(1)-(2). Premeditated murder and felony murder "are not designated by that statute as separate and distinct offenses but rather as alternate means by which criminal liability for first degree murder may be imposed." State v. Ely, 48 S.W.3d 710, 721 (Tenn. 2001). If a jury has convicted a defendant of both premeditated murder and felony murder in a case involving only one killing, the trial court should accept both verdicts but enter only one judgment of conviction, thereby merging the verdicts. See Carter v. State, 958 S.W.2d 620, 624-25 (Tenn. 1997). Additionally, we note that a general verdict of guilty will be sustained if any one count in the indictment is sustained by the proof. Tenn. Code Ann. § 40-18-111 (1997). In the instant case, the trial court properly

merged the convictions.[1]  Therefore, proof of either felony murder or premeditated murder will sustain the conviction.

We will first address the appellant's conviction for felony murder in the perpetration of a robbery.  As previously noted, felony murder as charged in count one of the indictment is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery."  Tenn. Code Ann. § 39-13-202(a)(2).  As to felony murder, "[n]o culpable mental state is required for conviction . . . except the intent to commit the [robbery]."  Tenn. Code Ann. § 39-13-202(b). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann. § 39-13-401(a) (1997).

Viewing the evidence in the light most favorable to the State, as we must, the evidence at trial showed that the appellant was driving his blue Cadillac on Dickerson Road on the night of the murder.  He was accompanied by his brother and two cousins.  After passing the Aztec store where the victim had just prepaid for gasoline, the appellant turned the Cadillac around and drove into the parking lot of the adjacent Taco Bell restaurant.  The appellant's brother, wearing a stocking cap, got out of the Cadillac and walked through the back parking lot, entering the Aztec store through a rear door.  The appellant then drove out of the Taco Bell parking lot and parked in the front of the Aztec store.  After a gunshot was heard, the appellant drove to the rear of the store and followed the Camaro out of the parking lot onto Dickerson Road.  The driver of the Camaro was wearing a stocking cap.  The appellant continued to follow the Camaro onto a side street. Subsequently, the Camaro was found nearby and it had been stripped of its tires and wheels valued at approximately five thousand dollars ($5000).  Also missing were the vehicle's stereo and speakers.

Notably, an impression of a tire matching one sold to the victim was found on the rear seat of the appellant's Cadillac.  The tire was a "Grand Spirit" tire, sold only by the Dunlap and Kyle Tire Company.  An employee of the company recalled selling a "Grand Spirit" tire to the victim. A Newport brand cigarette was recovered from the Camaro and testimony at trial confirmed that the appellant smoked Newport cigarettes.

In this case, the jury could conclude that the appellant and his brother saw the expensive wheels on the victim's Camaro as they drove past the Aztec store.  Deciding to take the wheels, they turned around and pulled into the Taco Bell parking lot, enabling the appellant's brother to sneak into the rear of the Aztec store while the appellant drove around to the front of the store. After the appellant's brother shot the victim and took the Camaro, the appellant followed his brother to a nearby dead end street where they stripped the Camaro and then attempted to burn it.  We conclude that the evidence was sufficient to support the appellant's conviction of felony murder.

As to the conviction for premeditated first degree murder, we agree with the appellant that the record is devoid of proof sufficient to support the conviction.  Count two of the indictment

---

[1] The trial court entered two judgments of conviction, but noted that the premeditated murder conviction merged into the felony murder conviction.

charging the appellant with premeditated first degree murder alleged that the appellant "unlawfully, intentionally, and with premeditation did kill Timothy Chandler, in violation of Tennessee Code Annotated § 39-13-202 . . . ."

Once a homicide has been proven, it is presumed to be a second degree murder and the State has the burden of establishing premeditation. Brown, 836 S.W.2d at 543. Premeditation is "an act done after the exercise of reflection and judgment," Tenn. Code Ann. § 39-13-202(d), requiring a "previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992).

The element of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Circumstances from which premeditation may be inferred include the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; a declaration by the defendant of his intent to kill; and the making of preparations before the killing for the purpose of concealing the crime. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Moreover, a jury may infer premeditation from the certain facts, including

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is *planning activity*;
> (2) facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred; and
> (3) facts about the *nature of the killing* from which it may be inferred that the manner of the killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (quoting 2 W. LaFave and A. Scott, Jr., Substantive Criminal Law § 7.7 (1986)).

In the instant case, the evidence reflects that the appellant and his twin brother planned to rob the victim of his car and the expensive wheels. However, there is no proof of a plan to kill the victim. There is no evidence of a prior relationship between the appellant and the victim, nor is there evidence that the appellant procured a weapon in order to shoot the victim. Although we acknowledge that it is not necessary that the purpose to kill pre-exist in the mind of the accused for a definite period of time, we cannot conclude that the circumstances in the instant case support, beyond a reasonable doubt, a verdict of premeditated murder.

### III. Conclusion

In summary, we affirm the appellant's conviction for first degree murder under count one of the indictment. Because the jury's verdict of premeditated murder under count two of the indictment is not supported by the evidence, we remand for modification of the judgment to reflect the appellant's conviction under only count one of the indictment.

_____
NORMA McGEE OGLE, JUDGE